J. Seth Moore
State Bar No. 24027522
semoore@swlaw.com
Zachary A. Cooper
State Bar No. 24137881
zcooper@swlaw.com
**SNELL & WILMER L.L.P.**
2501 N. Harwood Street, Suite 1850
Dallas, Texas 75201
Telephone: 214-305-7301
Facsimile: 214-305-7351
*Attorneys for TurningPointe, LLC, d/b/a Turning Point Strategic Advisors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 24-33924** |
| | § | |
| **WATER STATION MANAGEMENT LLC** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| | § | |

**TURNING POINT STRATEGIC ADVISORS' MOTION TO CONFIRM ERIC CAMM'S STATUS AS MANAGER OF WATER STATON MANAGEMENT OR, ALTERNATIVELY, TO EXCUSE TURNOVER PENDING DISMISSAL OR OTHER RELIEF**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

There will be a hearing on this motion on October 9, 2024 at 11:00 a.m. in courtroom 403, United States Bankruptcy Court, 515 Rusk Avenue, Houston, TX 77002.

## I.   INTRODUCTION

This case involves a water machine and vending machine business that stands accused in multiple lawsuits of fronting a fraud and Ponzi scheme. The enterprise runs primarily through three alter-ego entities: (i) Creative Technologies LLC; (ii) Refreshing USA, LLC; and (iii) Water Station Management, LLC (collectively, "**Debtor Entities**").[1] The principal actor behind this scheme is Ryan Wear. The claims against this enterprise exceed $200 million.

In this context, the Superior Court of King County, Washington, ("**Washington Court**") on May 14, 2024, appointed Turning Point Strategic Advisors ("**Receiver**") as a general receiver over Creative Technologies LLC. Under Washington law, a general receiver is charged with winding up the affairs of a business. Wash. Rev. Code § 7.60.015. A wind up can, of course, include a reorganization or restructuring if that is in the best interests of creditors. To that end, Receiver worked diligently to gather information and marshal assets for the benefit of creditors. Receiver did this work despite obfuscation and resistance by Mr. Wear and his right-hand man and corporate controller, Jeremy Briggs. Based on information gathered largely from third parties, Receiver concluded that Mr. Wear's enterprise was a relatively normal business until the onset of the Coronavirus pandemic. During the pandemic, it morphed into something bearing the hallmarks of corporate malfeasance and a possible Ponzi scheme.

On August 23, 2024, based on Receiver's presentation of hard evidence, the Washington Court issued an Order under the Washington Consumer Protection Act ("**CPA**") and under its equitable powers in receivership to remove Ryan Wear as Manager of the Debtor Entities and replace him with Eric Camm as Manager ("**Removal Order**"). The Removal Order found that Mr. Wear: (i) knowingly misrepresented the number and existence of water machines in connection with sales, investments, and secured loans; (ii) continued to misrepresent assets and finances after the receivership commenced; and (iii) disregarded the automatic stay imposed by the Washington

---

[1] Refreshing USA LLC and Creative Technologies, LLC are debtors in parallel involuntary cases also pending in this Court. *See In re Refreshing USA, LLC*, Case No. 24-33919; *see also In Creative Technologies, LLC*, Case No. 24-33934. Receiver has filed a substantively identical motion in both of these cases.

Receivership Act as well as a pre-existing temporary restraining order ("**TRO**") issued by the Superior Court of Snohomish County, Washington.

Notwithstanding his removal as manager and the automatic stay under 362, Mr. Wear has now attempted to exercise control over the Debtor Entities. Indeed, there is good reason to believe he has orchestrated this involuntary filing in an attempt to wrest corporate control from Mr. Camm.

This unusual situation raises a critical threshold question—*who properly controls the debtor-entity and putative debtor-in-possession?*

On one hand is Mr. Wear, who the Washington Court has already found to have knowingly misrepresented material information to creditors, buyers, and the public and who has defied (and continues to defy) existing court orders and statutory stays and who the Washington Court explicitly removed from office and replaced with Mr. Camm <u>before</u> the involuntary petitions were filed.

On the other hand is Eric Camm, who the Washington Court appointed to replace Mr. Wear with the support of creditors holding some $180 million of the roughly $200 million in claims. Mr. Camm is a principal with Receiver, deeply familiar with the issues in this case, and well-suited to serve as a neutral fiduciary. Perhaps most important, he is the Manager appointed under applicable state law <u>before</u> the involuntary petitions were filed.

The apparent dispute over who rightfully manages the Debtor Entities needs to be resolved now so the debtor and putative debtor-in-possession can properly function. Receiver respectfully submits that allowing Ryan Wear to have any management authority at all is highly detrimental to the creditors. As between Mr. Wear and Mr. Camm, the Court should hold that Mr. Camm is the rightful Manager or, at the very least to protect creditors, excuse Receiver's turnover of estate property so that it remains in the hands of an honest and neutral fiduciary.

## II.   RELIEF REQUESTED

Receiver respectfully requests an order pursuant to 11 U.S.C. § 105(a) holding that Eric Camm is the sole and proper Manager of Water Station Management.

Alternatively, Receiver respectfully requests an order pursuant to 11 U.S.C. § 543(d)(1) excusing turnover of property of the estate.

### III.   EVIDENCE RELIED UPON

This motion relies on the following concurrently filed sworn declarations:

1.      Declaration of Eric Camm ("**Camm Decl.**"), with exhibits;

2.      Declaration of Nick Howe ("**Howe Decl.**"), with exhibits;

3.      Declaration of Richard Brennan ("**Brennan Decl.**"), with exhibit;

4.      Declaration of Amit Ranade ("**Ranade Decl.**"), with exhibits, including relevant portions of the transcript of the deposition of Ryan Wear in the matter of *Axial Tilt LLC, et al. v. Waterstation LLC*, et al., Case No. 23-2-08829-31 (Snohomish County, Wash. Sup. Ct.) ("**Wear Depo.**"), and the Order Granting Plaintiffs' Motion for Temporary Restraining Order in the matter of *Pacific Water Technology, LLC v. Ryan W. Wear*, Case No. 24-2-02887-31 (Snohomish County, Wash. Sup. Ct.) (filed April 26, 2024) ("**TRO**").

### IV.   STATEMENT OF FACTS

**A.   General Background**

Three entities are relevant to this case: (i) Creative, (ii) Water Station, and (iii) Refreshing. Creative manufactures, sources, and sells water purification machines. Wear Depo., Vol. 1 at 20-21; *see also* Camm Decl., Ex. B. Water Station services water machines purchased by investors, most of whom would be creditors in this bankruptcy case. Wear Depo., Vol. 1 at 21. Refreshing owns and operates vending machines. *Id*. at 20 *see also* Camm Decl., Ex. B. Refreshing is also the central financial clearinghouse for <u>all machines</u> and <u>all revenue</u> generated by the combined enterprise. *Id*. Until recently, Ryan Wear was the majority owner and Manager of each Debtor Entities, and Jeremy Briggs, was his corporate controller. Camm Decl. ¶ 4, Ex. A.

**B.   Ryan Wear's Pre-Receivership Fraudulent Conduct**

In a deposition given in May, Mr. Wear testified that there are "somewhere between 14- and 15,000 [machines] on location. And there's numerous [machines] in warehouses that we have them stored at as well." Wear Depo., Vol. 2 at 102-03. He testified that "somewhere around 50 percent is owned by us and 50 percent by other owners." *Id*. at 103. To date, he has produced only three spreadsheets purporting to list water and vending machines. Camm Decl. ¶ 7. The topline numbers

in his spreadsheets do not match his deposition testimony:

| Excel File Name | Type of Asset | Count |
|---|---|---|
| Machine List | Water Machines | 4,889 |
| Machine List – WSM Parlevel with Cost | Water Machines | 5,134 |
| Fixed Assets CT | Vending Machines | 8,813 |

*Id.* According to former employees, as of February 2024, the combined enterprise had about 2,600 water machines in the field and another 3,500 water machines in warehouses in Arizona, Nevada, Georgia, and Texas. Brennan Decl. ¶ 9. Apparently, the enterprise also had about 19,000 vending machines in the field. *Id.* Based on financial records, it appears that Mr. Wear steered significant portions of the loans and investments made by creditors into his vending machine business and other businesses. *See id*; *see also* Howe Decl., Ex. B.

Moreover, it appears that, at least between October 2022 to September 2023,[2] none of these businesses operated as Ryan Wear described to lenders, investors, and the public. In deposition, he described these businesses as follows:

> I started – from [20]18 to current, I was starting the vending company with one Coke machine in Everett and have built that company to now what's called Refreshing USA.
>
> The – in roughly 2006, I started Creative Technology, which is dba Water Station [Technology]. And that company is – excuse me 2013 – is the entity that created Stark Manufacturing machines. And it purchased the IP technology from a gentleman. So we didn't develop it ourselves, but we started building that machine.
>
> Water Station Management was founded, I believe, in 2016 to service water machines and start replacing them ourselves.

Wear Depo., Vol. 1 at 36-37.

> So Water Station Technology builds a machine and it's a water machine. And basically they build that machine and sell it to customers…. Water Station Management services those machines and basically changes filters and provides that service.

*Id.* at 20-21. For this type of business, one would expect cash flow to reflect manufacturing and purchasing activities—*i.e.*, payroll and payments to vendors. Howe Decl., Ex. B at 9. One would

---

[2] Receiver chose this 12-month period of review because Jeremy Briggs reported that he did not update or reconcile accounting records for any transactions in 2024 and because the selected 12-month period aligns with the review period in a Quality of Earnings report by Marcum. Howe Decl., Ex. B at 9.

expect cash flow also to reflect sales of filtered water and vending inventory. *Id*. The actual cash flow for these entities does not match Mr. Wear's description.

According to Creative's QuickBooks files for October 2022 to September 2023, Creative had earnings of $108.7 million. Howe Decl., Ex. B at 7. But 99.97 percent of these "earnings" were in six "Journal Entry" lines. *Id*. A "Journal Entry" is a manually entered number. Howe Decl. ¶ 7. Neither Mr. Wear nor Mr. Briggs have provided any documentation or explanation for these entries despite repeated requests and Receiver having raised this issue in the Washington Court. *Id*. ¶ 8. What is more, bank records for this period do not show deposit activity anywhere near $108.7 million in operating revenue. Instead, they show $35 million in deposits, with half coming from affiliates— and not from actual sales. *Id*., Ex. B at 7. Absent documentation and explanation for this material discrepancy, the only possible conclusion is that Mr. Wear and Mr. Briggs simply fabricated the "Journal Entry" line items in QuickBooks. *Id*.

Financial records for Refreshing and Water Station are similarly incongruous with a business purportedly selling and managing thousands of water and vending machines. Refreshing had total deposits and withdrawals of $97.4 million. *Id*., Ex. B at 14. This included $74 million in deposits (76 percent of total) from affiliates and $61.4 million in transfers to affiliates (63 percent of total). *Id*. at 14-15. Refreshing had only $4.3 million in vending revenue and $15.3 million in payroll and vendor expenses over this same period. *Id*. Water Station had $129.8 million in deposits and withdrawals for this period. *Id*. at 16. This included $57.2 million in deposits from affiliates (44 percent of total) and $66.8 million in transfers to affiliates (51 percent of total). *Id*. at 16-17. Water Station appears to have generated <u>no</u> operating revenue—the rest of its deposits are from investors and the indenture bond—and it appears to have paid less than $12.7 million to vendors.[3] *Id*. Receiver has not been able to compare banking activity to QuickBooks because Mr. Wear and Mr. Briggs have refused Receiver access to the files for Refreshing and Water Station. *Id*. ¶ 7.

In sum, the Debtor Entities appear to operate as a single enterprise whose primary activity is simply moving money around—money paid, invested, or loaned by creditors. There does not appear to be an active water machine business, nor does there appear to be anywhere near the number of

---

[3] This figure includes payments to other uncategorized loans in addition to vendors.

machines that creditors thought they purchased or loaned against. For this reason, creditors around the country have filed multiple lawsuits against the Debtor Entities alleging that Mr. Wear's activities are a massive fraud and likely Ponzi scheme. Ranade Decl., Ex. J. Receiver presently estimates that the total claims against the Debtor Entities exceed $200 million.

**C.      Ryan Wear's Interference with a Receivership Wind-up for the Benefit of Creditors**

In one lawsuit, the Washington Court on May 14, 2024, appointed Receiver as a general receiver over Creative. Ranade Decl., Ex. O. Under Washington law, a "general receiver" is a receiver empowered to wind up the affairs of the debtor entity. *See* Wash. Rev. Code § 7.60.015. From the outset of the receivership, Mr. Wear and Mr. Briggs resisted Receiver's efforts to learn about the business, marshal assets, and determine whether a restructuring was possible before moving forward with a liquidation. Despite repeated requests for information, *see* Ranade Decl., Ex. H, Mr. Wear and Mr. Briggs forced Receiver to seek discovery orders compelling compliance. Even then, they refused to share material information necessary to locate and marshal assets. *Id.* ¶ 10.

From third parties, Receiver learned that Mr. Wear tracks machines in the field in a single "Vending Management System" database created and maintained by Parlevel Systems, Inc. Camm Decl. ¶¶ 6; Brennan Decl. ¶ 11. Unfortunately, the database contains no information tying individual machines to individual investors, lenders, or other entities. Brennan Decl. ¶¶ 6-9, 11. Receiver learned about the database only because a former employee (Richard Brennan) volunteered the information and through a subpoena to Cantaloupe, Inc., the payment processor. Ranade Decl., Ex. C. Mr. Wear himself never identified the database—much less facilitate Receiver's access to it. Similarly, Cantaloupe initially resisted Receiver's efforts to gain access into the system and take control of cash flows and accounts at the behest of Ryan Wear, as Manager of the Debtor Entities. S*ee id.*, Ex. I.

Perhaps most concerning, Mr. Wear surreptitiously attempted to transfer receivership property in violation of an automatic stay under the Washington Receivership Act, *see* Wash. Rev. Code § 7.60.110, and in defiance of a separately issued TRO. In late June, he instructed his lead salespersons to sell machines in the field so he could use the proceeds to make payroll and pay other expenses. Brennan Decl. ¶ 10. In mid-August, well into the receivership, Mr. Wear attempted to

close a sale of 62 machines through Refreshing's subsidiary in Georgia. *Id.*; *see also* Ranade Decl., Ex. D. Because Mr. Wear's databases contain no information tying specific machines to specific investors or lenders, and because it appears that Mr. Wear distributed investor funds among the Debtor Entities, this recent transaction likely involved property that belongs to one or more Debtor Entities. Moreover, he disregarded an automatic stay and TRO in pushing that transaction.

**D.      Ryan Wear's Continuing Material Misrepresentations to Investors and the Public**

Further, Mr. Wear and Mr. Briggs have continued to make material misstatements to potential lenders and investors. Since before the receivership, they have been working with AGRA Capital Advisors on a purported re-capitalization or re-financing transaction. Camm Decl. ¶¶ 11-13. After hearing rumors, Receiver inquired about this effort. Ranade Decl., Ex. A. In response, AGRA provided a "Due Diligence Report" commissioned by Mr. Wear and Mr. Briggs to support this purported transaction ("**Marcum Report**"). *Id.* The Marcum Report contains material misstatements that would further exacerbate the fraud that multiple lawsuits accuse Mr. Wear of perpetrating.

First, the income in Creative's QuickBooks does not match the Income Statement in the Marcum Report. Howe Decl., Ex. B at 8. The Marcum Report states that Creative had Net Income of \$21,845,000 and EBITDA of \$28,087,000, but contemporaneous QuickBooks records show Net income of <u>negative</u> \$4,393,768.32 and EBITDA of only \$9,444,000. *Id.* Despite multiple requests for explanation and raising this discrepancy to the Washington Court, neither Mr. Wear nor Mr. Briggs have addressed it. Howe Decl. ¶ 8. Absent explanation, these discrepancies indicate fraud, or, at the very least, grossly negligent financial controls that must be corrected before new sources of capital can rely on these reports. A review of 46 bank statements shows a consistent pattern of money flowing in from one affiliate and disbursed shortly thereafter to other affiliates, leaving nearly zero-dollar balances at the end of each month. *Id.*, Ex. B at 10. The activity in bank records does not align with a company that purports to have a combined EBITDA of \$36.5 million as stated in the Marcum Report. *Id.*

Second, the Marcum Report says "Creative has recorded notes receivable from Summit … for advances that were used by Summit to acquire third party vending companies that now form the RUSA vending network … [and that] the Company has recorded notes receivable with Pistol, Inc.,

Aurora QB, and Ideal." Ranade Decl., Ex. A at 19. Receiver specifically and repeatedly requested all documentation for intercompany loans. *Id*., Ex. H. That request remains outstanding to this day.

Third, the Marcum Report asserts that Creative owns vending machines and pays "investors fees related to equipment that is held and managed by [Water Station]." Ranade Decl., Ex. A at 19. Receiver has been asking for lists of all personal property, including water machines and vending machines. *Id*., Ex. H. To date, Mr. Wear's only response has been to refer to the database noted above, in which one cannot tell who owns what. Camm Decl. ¶ 6. The Marcum Report likewise asserts that "the Company" (i.e., the Debtor Entities combined) owns about 271 vehicles. Ranade Decl., Ex. A at 21. That number was apparently 350 to 400 in February. Brennan Decl. ¶ 12. Regardless, Mr. Wear has yet to admit these entities own any vehicles at all, let alone provide information about them. Ranade Decl. ¶ 10.

Fourth, the Marcum Report mischaracterizes the organizational structure of the companies. It says Summit Management owns one percent of Water Station. Ranade Decl., Ex. A at 13. Water Station's Operating Agreement, however, says Mr. Wear is the sole owner. Camm Decl. Ex. A at 4. Similarly, the Marcum Report claims Summit owns 88.9 percent of Refreshing and that Water Station owns the other 11.1 percent. Ranade Decl., Ex. A at 19. Refreshing's Operating Agreement, on the other hand, says that Richard Wear owns 10 percent and Ryan Wear owns 90 percent. Camm Decl., Ex. A at 8.

Mr. Wear and Mr. Briggs are Marcum's primary source of information. They know the information they are supplying is false and incomplete. They know investors and lenders will rely on this information, yet they have taken no steps to correct the inaccuracies.

Receiver asked Mr. Wear, Mr. Briggs, and AGRA Capital about the inconsistencies in the Marcum Report. Camm Decl. ¶ 13. Receiver emphasized the need for accuracy and transparency to gain the support of Receiver, courts, and creditors. Receiver's requests and admonition have gone ignored; Mr. Wear, Mr. Briggs, nor AGRA Capital have yet to provide a meaningful reconciliation of the inconsistencies in the Marcum Report that is drafted to support a recapitalization or refinancing. To the extent it is still relevant, Receiver remains open to a restructuring. But any such transaction must be based on accurate data and transparency with all major stakeholders. Thus far,

Mr. Wear and Mr. Briggs have provided neither of those things.

**E.    Ryan Wear's Removal as Manager and Loss of Equity in Creative**

In light of the ongoing misconduct described above, the Washington Court on August 23, 2024, issued an order removing Ryan Wear as Manager of the Debtor Entities and replacing him with Eric Camm ("**Removal Order**"). Ranade Decl., Ex. P. Based on a record with substantial and uncontroverted evidence, the Washington Court made several material findings of fact:

> 1.    The assets and liabilities of the Debtor Entities cannot be reasonably separated;
>
> 2.    In violation of the Washington Consumer Protection Act, Wash. Rev. Code ch. 19.86, Ryan Wear engaged in deceptive acts and practices both before and after the appointment of Receiver; and
>
> 3.    Ryan Wear violated the automatic stay under Wash. Rev. Code § 7.60.110 as well as the restraints imposed by a pre-existing TRO.

*Id*. Accordingly and pursuant to the Washington Consumer Protection Act, the Court removed Ryan Wear as manager, divested him of all management authority, and replaced him with Eric Camm as manager with authority to file voluntary bankruptcy petitions. *See id*. The Washington Court entered the Removal Order on August 23, 2024—four days <u>before</u> the petitioners initiated this case.

Additionally, Ryan Wear gave up his equity interest in the Debtor Entities. On June 27, 2024, Tyler Sadek, a creditor, obtained a judgment in Indiana against Mr. Wear and others on a debt secured by, among other things, Mr. Wear's equity in the Debtor Entities. Ranade Decl., Ex. K. On July 19, 2024, Mr. Sadek obtained in Indiana an order appointing a Commissioner to transfer Mr. Wear's equity in full or partial satisfaction of Mr. Sadek's judgment. *Id.* On or about August 1, 2024, the Indiana court's appointed Commissioner executed an assignment transferring to Mr. Sadek the entirety of Mr. Wear's equity in these entities. *Id*., Ex. L. Mr. Wear never challenged any of these acts. What is more, Mr. Sadek has since executed corporate resolutions, *see id.*, Ex. M., affirming as an internal corporate matter the outcome set forth in the Removal Order—*i.e*., that Eric Camm is now the Manager of each of the Debtor Entities with authority to operate these entities in bankruptcy.

**F.    Ryan Wear's Orchestration of this "Involuntary" Case and Further Interference with Receiver's Custodial Efforts**

Despite the Removal Order and the unchallenged transfer of his equity interests, Mr. Wear continues to interfere with Receiver's custodial activities. On August 23, 2024, the very day the

Washington Court replaced him with Mr. Camm, as Manager, Mr. Camm reached out to Mr. Wear and Mr. Briggs seeking cooperation on a number of operational issues including payroll. Camm Decl., ¶ 15. Initially, Mr. Wear and Mr. Briggs ignored him. On Tuesday, August 27, 2024, Mr. Camm and his colleague, Nick Howe, went to the Debtor Entities' headquarters in Everett, Washington, to discuss the critical operational issues in person. *Id.*

During the meeting, they learned the business had not made payroll in at least three weeks and that an employee named "Danielle" handled payroll. *Id.* ¶ 16. Mr. Briggs confirmed again that he had not updated the Debtor Entities' books for calendar year 2024 and that he could not allocate cash flow among entities or investors and lenders. *Id.* ¶ 15.

Making payroll become Mr. Camm's immediate concern. He asked Mr. Briggs to introduce him to Danielle. *Id.* ¶ 16. Rather than work with Mr. Camm to address pressing payroll issues, Mr. Briggs evaded Mr. Camm. He said Danielle was in a meeting, went into his office, and locked the door behind him. *Id.* After an hour of waiting, Mr. Camm knocked on Mr. Briggs's door to ask how much longer Danielle would be in a meeting. *Id.* Astoundingly, Mr. Briggs said that Danielle had left for the day. *Id.* They never connected Mr. Camm with Danielle. *Id.* This deliberate evasion in regard to payroll hurts innocent employees and puts these businesses at risk for wage and hour violations under applicable non-bankruptcy laws.

Moreover, there is good reason to believe Mr. Wear has orchestrated this involuntary case to wrest control of these businesses away from Mr. Camm. For example, two petitioners in Refreshing are related to Ryan Wear or Jeremy Briggs. *See* Ranade Decl., Ex. N.

## V.    AUTHORITY AND ARGUMENT

One thing is clear—Ryan Wear should not be allowed to manage the Debtor Entities, nor should he be allowed to control estate property. The Court should confirm that Eric Camm is the proper Manager pursuant to pre-petition orders issued under applicable state law or, alternatively, excuse Receiver from turnover thereby keeping property of the estate in the hands of an honest and neutral fiduciary.

**A. The Court should order under 11 U.S.C. § 105 that Eric Camm alone is the Manager of the Debtor Entities.**

This Court has authority to determine and resolve controversies necessary to carry out the provisions of the Bankruptcy Code and prevent an abuse of process. 11 U.S.C. § 105(a). Courts have employed this provision in conjunction with 11 U.S.C. §§ 1107 and 1112 to resolve corporate governance disputes. *See*, *e.g.*, *In re Buda*, 252 B.R. 125 (Bankr. E.D. Tenn. 2000) (relying on Sections 105 and 1112 to dismiss bankruptcy petition for lack of authority to file). "Sections 105(a) and 1107(a) may empower a bankruptcy court to prevent a debtor from removing a manager, officer or director, but they do not provide the Court with an independent power of appointment [and the Bankruptcy Code] leaves state corporate governance law largely untouched, the primary exception being the power to order the appointment of a chapter 11 trustee pursuant to § 1104." *In re 1031 Tax Group, LLC*, No. 07–11448(MG), 2007 WL 2085384, at *3 n. 4 (Bankr. S.D.N.Y. July 17, 2007)

Here, the Washington Court removed Ryan Wear and appointed Eric Camm as Manager of the Debtor Entities pursuant to state corporate governance law. This happened on August 23, 2024, underline before the involuntary petitions initiating this case were filed.[4] Further, the current and undisputed equity holder—Tyler Sadek—signed a corporate resolution affirming on behalf of equity that Eric Camm is the Manager with authority to operate the Debtor Entities in bankruptcy. As a result of the Removal Order and corporate governance action, the proper Manager of the Debtor Entities is Eric Camm—not Ryan Wear. To avoid doubt about this, the Court should so order.

**B. Alternatively, the Court should excuse Receiver from turnover pursuant to 11 USC § 543(d)(1).**

In no event should Ryan Wear be allowed to manage the Debtor Entities. Accordingly, if the Court declines to give effect to the Removal Order, the Court should excuse Receiver's turnover of estate property. Courts have authority, after notice and a hearing, to excuse a custodian's turnover of estate property. 11 U.S.C. § 543(d)(1).[5] A custodian seeking to excuse turnover must show that

---

[4] Mr. Wear may argue that he moved for revision of the Removal Order. Under applicable court rules, the Removal Order remains in full force and effect unless and until it is subsequently revised. *See* King County, Wash. Local Rule 7(b)(8)(B)(iv). Mr. Wear's revision motion was pending when the petitions initiating this case were filed. The Washington Court has done nothing further with Mr. Wear's motion.

[5] Receiver is a "custodian" under the Bankruptcy Code. *See* 11 U.S.C. § 101(11).

leaving the custodian in place is in the best interests of creditors. *Id*. In deciding whether to excuse turnover, "a court may consider: (1) whether reorganization is likely; (2) that funds are necessary for such a reorganization and funds exist which will be applied towards it; and (3) mismanagement." *In re Powers Aero Marine Servs., Inc*., 42 B.R. 540, 544 (Bankr. S.D. Tex. 1984); *see also* 5 <u>Collier on Bankruptcy</u> ¶ 543.05 (Levin & Sommer eds., 16th ed., 2024).

Here, all three factors support excusing turnover. First, the facts here cast serious doubt on a successful reorganization. From the outset, Receiver has said repeatedly that it is open to a refinancing or restructuring. Receiver asked to be brought into the discussion. Unfortunately, Mr. Wear, Mr. Briggs, and AGRA Capital responded with evasion and obfuscation. The only actual data they have shared is the Marcum Report, which is riddled with material misstatements. No one has explained these inaccuracies. What is more, Mr. Briggs admits he has not kept the books at all for this entire calendar year. He and Mr. Wear also admit there is no way to tie individual machines to individual investors or lenders. While one should "never say never," the prospects of a reorganization seem very unlikely.

Second, Mr. Wear and Mr. Briggs have not managed funds in a responsible manner that would support reorganization. In *Bryan Manor, LLC*, 422 B.R. 278, 290 (Bankr. D. Kan. 2010), the Kansas Bankruptcy Court excused a custodian's turnover in part because the debtor failed to make required payments despite having a budget that allowed the debtor to do so. Here, Mr. Wear and Mr. Briggs have not made payroll in at least three weeks despite asserting in the Marcum Report that their businesses generate tens of millions of dollars in gross income.

Third, the record here is rife with evidence of malfeasance and mismanagement. Receiver's financial analysis indicates that, at least since the pandemic, this enterprise appears to have devolved into a likely Ponzi scheme. There is little to no actual operating revenue. Incoming funds are primarily new investments and loans, and half or more of the enterprise's cash flow is simply moving money around between entities. What is more, Mr. Wear knowingly and intentionally violated receivership stays and a TRO that restrained his ability to transfer assets. He is not trustworthy and does not appear interested in following Court orders.

For these reasons, if the Court is disinclined to give effect to the Removal Order, it should at

a minimum excuse Receiver's turnover and keep property of the estate in the hands of an honest and neutral fiduciary.

## VI.    CONCLUSION

After finding that Ryan Wear engaged in fraudulent activities and defied previous court orders, the Washington Court removed him as Manager and appointed Eric Camm in his place. The Removal Order was in full force and effect on the petition date, and it remains so today. The Court should order under 11 U.S.C. 105(a) that Mr. Camm is Manager of the Debtor Entities to resolve any doubt about who controls the debtor and putative debtor-in-possession in this case.

In the event the Court decides not to give effect to the Removal Order, the Court should excuse Receiver from turnover and keep property of the estate in the hands of a faithful and neutral fiduciary.

Dated: September 5, 2024                SNELL & WILMER L.L.P.

By: */s/ J. Seth Moore*
    J. Seth Moore
    State Bar No. 24027522
    semoore@swlaw.com
    Zachary A. Cooper
    State Bar No. 24137881
    zcooper@swlaw.com
    2501 N. Harwood Street, Suite 1850
    Dallas, Texas 75201
    Telephone: 214-305-7301
    Facsimile: 214-305-7351

    Amit D. Ranade (*pro hac vice* pending)
    aranade@swlaw.com
    **SNELL & WILMER L.L.P.**
    600 University Street, Suite 310
    Seattle, Washington 98101
    Telephone: 206-741-1420
    Facsimile: 206-741-1489

    *Counsel for TurningPointe, LLC, d/b/a*
    *Turning Point Strategic Advisors*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on September 5, 2024, a true and correct copy of the foregoing motion and supporting documents, was filed via the Court's Electronic Case Filing (ECF) system, and thereby served on all parties registered to receive electronic notice in this case.

*/s/ J. Seth Moore*

J. Seth Moore

4876-8581-0913.1